May it please the court. The pro se defendants in this case were prejudiced by the failure of Ohio National to tender them the required Rule 56.2 notice because both the torts in the case, conspiracy and fraud, are specific intent torts and the intent of these defendants was a disputed fact in the case. The first tort at issue, conspiracy, the district court held that everyone is presumed to know the law. That's really not the case with conspiracy. Conspiracy is a tort that requires a specific intent to violate a known right or to commit an illegal act. The finding of the district court in this case was that these, what are called stranger originated life insurance contracts, were void ob initio because the defendants lacked an insurable interest. We don't quarrel with that finding, but that does not indicate a conspiracy. The determination of whether or not these contracts were void ob initio or not is simply a matter of contract law. It's not a matter of tort law at all. Something additional is required to show that this is a conspiracy. The example I would use, I think, is if a board, a school board or something, hired a teacher and the contract extended beyond the term of the board. That is a void ob initio contract. It's a matter of contract law. The contract never existed, but it's not a conspiracy. The conspiracy requires more than contract law. It requires intent under tort law and that intent is to violate a known right or do something in a legal manner. And in my research, I have never seen a void ob initio contract labeled a conspiracy who was the insurance agent in this case, was based upon her admission that she had not actually met these applicants and not taken any of the information. However, she wasn't required to. She was able to delegate this responsibility to one of her employees who was a registered insurance agent and who had cleared this process with Ohio National. So the fact that she admitted she had not taken these applications, had not met the applicants, does not indicate fraud on her part. Fraud, once again, requires an intent to deceive Ohio National and she did not, and she submitted an affidavit that she did not intend to deceive them. The insurance agent submitted his own affidavit that said he had taken the applications, he had done so with the permission of Ohio National. This business of speculative life insurance contracts, this is lawful? Not in Illinois and particularly not since 2010 when Illinois passed a statute specifically making it unallowable. It is apparently permissible in the Eighth Circuit. I cited a case from the Eighth Circuit where they said, what are we talking about here? If somebody gets his own life insurance with the objective of selling it to somebody, who does that harm? Now in Illinois, and the defendants have said, well it gives you an incentive to murder the person. Right, that was the traditional law. Well, if you murder somebody, how are you going to collect the life insurance? You try not to be caught. You try not to be caught, but it results in a void ab initio. Murdering here, you know, there's a long history of that. But what you resulted in is a void ab initio contract, not avoidable. There's nothing you can do to make that contract good. Yes, in Illinois, it's void ab initio. The contract never existed, so you didn't accomplish anything by your shenanigan, but all I'm saying is that does not make it a conspiracy. You can be wrong, and in this case, the defendants believed they were operating under an opinion letter that said how they were doing it was appropriate. I don't, I must say, I don't even comprehend what's going on here. All conspiracy means in law is agreement. And there's, I take it, no doubt whatsoever that the defendants agreed that they were going to buy and then resell these policies. Whether what they agreed to do is legal or not is not important to the definition. So what's the problem here? Everybody in the room agrees that these contracts were illegal in Illinois, and it's conceded that the three defendants agreed to pursue them. What else do we need? Well, Judge Easterbrook, with all due deference, conspiracy is not just an agreement. Conspiracy is an agreement to commit an illegal act. No, conspiracy is an agreement to do something. It may be legal or illegal. Yes, but it, no, it has to either be illegal or you have to do it in an illegal manner. To be a conspiracy, and moreover- It's actionable only if the object is illegal. Well, you can't call it a, then you would call the school board a conspiracy to hire the teacher, and they could be sued for conspiracy, which is a tort. Only if the object is illegal. Well, in that case, it was because it extended- And everybody here agrees that the object of this agreement was illegal. The object was not allowed by Illinois law, but the term illegal can connotate a state of mind, and in this case, conspiracy requires a state of mind. And that's Illinois law, and the Hecox case is clear on that point, where they say, because one must be aware of the harm or wrongful conduct at the beginning of the combination agreement. Thus, civil conspiracy is an intention. Why did they agree? What? Why did they agree? Because they thought they had, as was done in New York, apparently California, and Minnesota, a clever way of making money. And the money would be, people take out life insurance, they can take out life insurance, and then they were offered to buy it from them. But why the agreement? What did the agreement add to the individuals doing this? Well, that's an excellent point, Judge Posner, because a conspiracy doesn't exist without an underlying tort, so there's got to be an underlying tort here. It hasn't really been defined because they were just- This is not my question. Yes. Why the agreement? What were the benefits conferred by the agreement, rather than just these individuals doing it individually? Well, you had three people who had separate parts in it. One of the people provided the financing for the thing, the other person provided the customers for it, and the third person was an insurance agent. And so I think you needed all those wheels for it. Okay, well that suggests that you have an enterprise, and Judge Easterbrook's question was, you have an enterprise which engages in an illegal activity, that's its whole raison d'etre, then why don't you have an actionable conspiracy? Because I'm saying in Illinois law, that's not enough. Illinois requires a specific intent, and specific intent ones, I'll give you an example. Well, I have a specific intent to sell these illegal insurance policies. But, Judge Posner, that's not the specific intent required. The specific intent is the intent to do something wrongful or to harm, to commit a harm. Well, I don't understand. Violating the law, that is wrongful, right? If the purpose of this organization, this agreement, was to violate Illinois' law against this speculation insurance contract, why isn't that the evil intent? It wasn't the purpose of the agreement. The purpose of the agreement was to acquire insurance contracts which they believed they were doing lawfully. It turned out they were wrong, that they were void of an issue. That's a contractual matter, but it doesn't mean they intended to do something illegal. And so the only other point I really brought to the district court's attention was that the exception to the American rule for attorney's fees just wasn't met in this case. This litigation all centered on these three individuals. The other contracts had fallen aside, lapsed. The only other one you're going to hear from involves whether or not the premium should be repaid. And so they litigated conspiracy and fraud. That's not an exception to the American rule. I don't think you're right when you say that conspirators have to know that what they're doing is illegal. They're agreeing to do something illegal. Now, they didn't bother to do any investigation to find out that what they were doing was legal. Well, if you disagree with me, then I have misread the Illinois law, which I think specifically says that. I have also misread Oliver Wendell Holmes and his treaties on the law that says the same thing. So if I'm wrong about that, that is my position. Holmes wrote about Illinois insurance law? No, he wrote about conspiracy law. Thank you. Okay. Thank you, Mr. Lang. Ms. Herring? Good morning. May it please the Court, my name is Jacqueline Herring, and I represent Ohio National Life Assurance Corporation. What Paul Marady, Mavash Marady, and Douglas Davis did is they entered into an agreement to acquire life insurance policies without an insurable interest, and they succeeded in the object of that conspiracy. Ohio National issued five life insurance policies on five Illinois insureds. Well, Mr. Lang says they didn't know they were doing anything illegal. The evidence refutes that. However, for conspiracy, what the intent that is required for conspiracy is an intent to engage in the activity that leads to the object of the conspiracy. But he said that they didn't realize that there's no evidence that they knew what they were doing was illegal. Even if that were true, conspiracy does not require that they understand that the end result is illegal. Otherwise, there's basically no civil liability for anything because anyone can always say, I didn't intend to break the law, I intended to punch you in the nose, but I thought as long as I didn't use a weapon... Did they have any legal advice that was given to them that said what they were doing was legal? Absolutely not. The Louis Brisbane letter that's been referred to specifically tells them, if you buy the interest in these policies before the policies are ever issued, that is a violation of Supreme Court law as well as Illinois law. What the Louis Brisbane letter was addressing is, after an insured on his own has a policy, he's got a life insurance policy for a period of time, he decides that he wants to sell it, that that is something that the insured could do. But that's simply not what occurred here. These policies, many times before an application was even signed, Paul Marady owned the beneficial interest in these policies. He purchased the interest in the trust and then they named the trust as the owner and beneficiary of the policy. So Mr. Marady, before Charles Bonaparte ever signed the application in June of 2007, Mr. Marady had already purchased the interest in the trust. He owned the trust and the trust was designated as the owner and beneficiary of that policy. Charles Bonaparte never owned that policy, never made a decision to sell that policy, and that was the intent of their agreement from the beginning. Months before these policy applications were signed, they had the insured signing authorizations so that APG, Mavash Marady, Paul Marady, Douglas Davis, could shop their information to life settlement providers, which are people who buy life insurance policies. And in many cases, Paul Marady was advertising marketing policies for sale that had never been applied for or issued. So this is not a situation, as was addressed in the Louis Frisboe letter. Instead, these three individuals specifically combined, and they each had different roles in what was going to happen, and the object of their conspiracy was to procure these policies without an insurable interest, and that's what they did. And along the way to doing that, Mavash Marady committed fraud. Mr. Lange says that it's only that she didn't see the people in person. That's not the basis of the fraud claim here. In the application, one of the specific questions is, do you have or are you applying for other life insurance? That's checked no. Mavash Marady signs this is true and correct. She was the agent on other major life insurance policies that had either already been issued to these insureds or that were applied for on the same day. So that was absolutely incorrect. She knew it was incorrect. On her agent's reports that she's sending to Ohio National in order to get these policies, she's asked, how well do you know this person? She says, they are well known to me. Did you meet this person in person? Yes, I did. What is their income? It's this dollar amount. I know that because I reviewed their financial documents. They're not well known to me, but I had an agent who talked to them on the telephone. Or I didn't meet them in person, but my agent talked to them on the telephone. She specifically falsely represented that these people were well known to her, that she met with them in person, that she knew what their financial situation was because she had reviewed their financial documents, not because she had estimated the amount  but because she reviewed the documents. All of that information is then relied on in issuing that policy by Ohio National. That's the fraud here. It's not I delegated something, which actually her contract does not allow her to do, but even if that were the case and she had delegated it somewhere else, that's not a license to lie on the application or on the agent's report. And that's what she did in this case, and she admitted that she lied. She didn't know these people, never met these people, didn't know anything about them, and she applied for additional insurance on their life that she failed to disclose. In addition to failing to disclose that the premiums were going to be paid by her husband, Paul Moready, and not by the insurers, and Ohio National's business practices specifically prohibit her from submitting any application where she knows or has reason to believe that premiums will be paid by some third party who's unrelated to the insured. And she submitted all these applications anyway, and when asked, is there anything else that's not here in the application that we need to know about, she said no. That is what the fraud is in this case, and that was all part of the conspiracy. That was her role in the conspiracy, to submit these applications to Ohio National, and she then collected commissions as a result of submitting those applications. Douglas Davis's role was to go to churches and solicit people, and what Charles Bonaparte says is not, yeah, I was getting this policy on my own and I decided later to sell it to someone. No, he had no intention of applying for a policy. He was getting a cash payment for, in his words, letting them use his name to take out the insurance so they could get their own profit from the benefit, and what he would get in return is essentially a kickback, a portion, a cash fee, in order for allowing them to use his name in that way. And that is also not legal under Illinois law. And that was the object of the conspiracy. They accomplished the object of that conspiracy, and Mav Ashbery committed fraud in the process of that conspiracy. The damages that were awarded to Ohio National. Illinois law allows for all damages that are the natural and proximate result of the tortious act. And in this case, what they did was they got policies that were needed to be declared void ab initio. If Ohio National had not sought to have those policies declared void ab initio and one of these insured had died, we would then be litigating about, is this policy payable, is this policy not payable? And there's also authority in Illinois law where insurers have actually been sued by people with familiar relationships with the insured. For example, a spouse. And there is Illinois law where the insured has been murdered and someone tried to collect the insurance benefits and the insurance company was sued along with the individual who had supposedly conspired to commit the murder. So action had to be taken when Ohio National discovered what was going on. Action had to be taken and the only action that could be taken is legal action. The defendants, did they have any... What kind of background did they have in insurance? I'm concerned about what Mr. Lang said, that they didn't know that what they were doing was illegal. Mr. Davis is an attorney, or was an attorney. He's now been disbarred in California, but Mr. Davis is an attorney. He prepared all of the documents, the trust documents, as well as the sale documents. So Mr. Davis was legally trained at Georgetown in Washington, D.C. Muvvash Murady was an insurance agent for at least 10 years, I believe 15 years, operated with CEO of her own insurance agency. That was who? Muvvash Murady, Mrs. Murady. She was an insurance agent for approximately 15 years, and again, CEO, operated her own insurance agency, up to 12 employees at her agency at any given time. The third individual, Paul Murady, has a bit of a checkered history in the financial services industry. He's had previously been indicted and convicted for some financial crimes that he had to be extradited from Hong Kong to answer for. So he has in the past been, I don't recall if he was the president, but he was an officer of some type in a savings and loan in California. So, you know, these are not unsophisticated people. These are people who have means, who engage in this type of activity, and as Mr. Lang said, thought they found a way to circumvent the law here and do it here. And in fact, what they were doing here was illegal, and it was intentionally illegal, and the remedy that Ohio National had to seek was to make sure that these policies were declared void so that we would not have to pay out on the policies later or be sued by other people later. So the legal action was required conduct, and when what your tortious conduct does is involve the victim in third-party litigation with others, which is exactly what occurred here, involving Mr. Egbert, Mr. Tice, who was another one of the trustees, as well as Christiane Bank, another trustee, in order to get the policies declared void ab initio. Yes, along with that litigation, we had a conspiracy claim, a fraud claim, a breach of contract claim, but it wouldn't make sense to have those in separate, parallel litigation. So they were combined in one lawsuit, but the evidence that's required to establish that these policies are void ab initio is the same evidence that establishes the conspiracy, the fraud, and the breach of contract. So those damages under Illinois law are absolutely recovered. Simply because your damages take the form of legal fees instead of, for example, accounting fees or from some other profession does not preclude recovery of those damages. And the district court correctly made that determination, and there was no opposition below to the amounts or the reasonableness of either the fees or the litigation expenses. So those were undisputed, and the district court properly awarded them. With respect to the premiums for the Bonaparte policy that were awarded to Mr. Egbert, however, the district court erred in awarding those to Mr. Egbert. Mr. Egbert at no time asserted any sort of equitable claim or any other claim to the proceeds. In fact, throughout summary judgment and up until his appellate brief in this case, Mr. Egbert vociferously contested the validity of the policy. Despite Charles Bonaparte's testimony... And what's your concern about Egbert, that the damages should have gone to your client? Yes, Your Honor, a judgment was entered against Ohio National for $90,000 to be paid to Mr. Egbert, and that $90,000 represented premiums that had been paid by Mr. Egbert on the Charles Bonaparte policy after Mr. Egbert purchased that policy from Mr. Moretti. And those premiums should have been awarded to Ohio National. They certainly should not have been awarded to Mr. Egbert. The law in Illinois is when a contract is declared void ab initio, courts must leave the parties where they are. And leaving the parties where they are puts those premiums in possession of Ohio National, and Ohio National made that claim of right and should have been allowed to keep those premiums. What the district court did was manufacture, on behalf of Egbert, a claim for unjust enrichment, that Mr. Egbert had never pled at any time throughout the litigation. And that would be actually a compulsory counterclaim that he would have had to have pled in order to attempt to collect on. And he never pled the claim, but the court created one for him and then decided that the equities went in favor of Mr. Egbert on his unpled claim. So the first problem, again, is the claim was never pled. We never had an opportunity to defend on that claim. So it was improper for the court on summary judgment to create that claim in favor of Mr. Egbert. In addition, based on the evidence that was before the district court, the equities do not weigh in favor of Mr. Egbert. There's a number of things that Mr. Egbert did in this case that do not make an equitable award to him appropriate. The first is, again, there's information on the applications. Mr. Bonaparte was issued two different policies, one by Ohio National, one by AXA Equitable. Mr. Egbert purchased both of those policies. Policy applications, again, asked, are you applying for any other insurance or do you have any other insurance? The answers were no. Mr. Egbert said he reviewed those applications before he ever purchased the policies, so he knew that there was false information on those applications. Purchased the policies anyway. In his transaction documents, Mr. Egbert made false representations, saying that he was an investment fund. At his deposition, he said, I'm not an investment fund. I've got nothing to do with any investment funds. I'm a private individual. So he made misrepresentations of his own in the purchase documents. And also, he was appointed, took over the trusteeship of the irrevocable trust that held the policy, took over trusteeship from Douglas Davis, and yet his actions directly violated multiple terms of the trust. The trust had an anti-alienation provision. Okay, I think that's enough about Egbert. Thank you. Let me ask you another question. Charles Bonaparte? Yes, sir. Is he any relative to the famous Bonapartes of France? That's a question of curiosity. Not to my knowledge, and I didn't ask him that at his deposition, so I don't know the answer to that. It'll remain a mystery. Thank you. Okay, well, thank you very, very much, Ms. Herring. Okay, Mr. Galeno? Good morning, Your Honors. May it please the Court. My name is Greg Galeno, and I represent Stephen Egbert in this matter. It would be a travesty of justice for Ohio National to get the relief it requested, cancellation of the insurance policy, as well as the windfall of retaining the $90,000 in premiums paid by Egbert, who was an innocent third-party investor who had absolutely no knowledge of the fraud or the scheme regarding the procurement of the policy. Ms. Herring just said that he might not have known that this was a fraudulent scheme, but it's hard to call him innocent if he filed an application full of false statements. So are you pretending that all of his statements were true and correct? Mr. Egbert did not file an application containing false statements. I believe what Ms. Herring said was that he reviewed the application that had been filed by Mr. Bonaparte to apply for the insurance policies and that those applications contained false statements. Mr. Egbert did testify at deposition that he did review the applications prior to purchasing the policy. I believe his testimony in this regard was that he skimmed them. He was presented with a stack of documents in conjunction with- It's an old line in contract law that you're responsible for what you sign whether you choose to read it or not. Yes, Your Honor, that is true. But the fact that he did not- If there were a rule that you weren't responsible for what you signed, that would, of course, lead people never to read the documents they signed. That is correct, Your Honor. But regardless of whether he- Despite the fact that he reviewed the application and that there was the false statement that he may have realized, he still had no knowledge of the fraudulent scheme. He had no knowledge that the policy was purchased by Mr. Mirati prior to him purchasing it. And, in fact, the way that they set up their scheme was they had Mr. Bonaparte re-sign all of the documents assigning the interest to Mr. Egbert. So Mr. Egbert thought that he was purchasing the policy directly from Mr. Bonaparte more than five months after the policy had been issued. There is- Under Illinois law, once a life insurance policy is validly issued, it is an assignable asset just like any other asset, like a stock, a bond, or anything else. And so him purchasing the policy on the secondary market was not illegal under Illinois law back in 2007. In 2010, the legislator did enact legislation which highly regulates the purchasing and selling of life insurance policies on the secondary market. But at the time that he purchased this policy, none of that was in effect. The only requirement was that the policy be validly issued. In regard to retention of the premiums, and Ohio Nationals claimed that Egbert's not entitled to retain them as a matter of law because he never filed a counterclaim for unjust enrichment, this ignores the contentions in Ohio Nationals' amended complaint and their claim for leave. Specifically, Ohio Nationals raised the issue of whether it was equitable for it to retain the premiums by asking the district court for a ruling to that effect while disclaiming any right to rescission. In addition, Ohio Nationals sought equitable remedies, including an accounting relating to the policies, placed the premiums into a constructive trust and deposited them with the court, and requested that the court distribute them as it deems just and equitable. Therefore, the equitable distribution of the premiums was put directly at issue by Ohio Nationals. In addition, equitable distribution of the premiums was put at issue by Illinois law. Under Illinois law, it's a fundamental maxim of jurisprudence that he who seeks equity must do equity. And by requesting an accounting, that placed the relief that Ohio Nationals was seeking in the realm of equity. And when you're proceeding in equity and you're seeking the aid of a court in equity, if rights, if equitable rights are raised in favor of a defendant, the recognition and protection of those rights will be imposed as a condition of granting relief. And that's exactly what the district court did here. And so based on those principles, the unjust enrichment claim did not have to be adjudicated as a separate independent cause of action, as Ohio Nationals contends. Rather, the unjust enrichment claim rested on the same improper conduct alleged in the declaratory relief action as well as the request for accounting. And because it was tied to that related claim, it could be adjudicated with that related claim. Illinois law also provides the court with broad discretion in fashioning an equitable remedy. Accordingly, the district court properly recognized and protected Egbert's legal rights. Okay. Thank you, Mr. Galeno. Thank you. Mr. Lange, I'll give you another minute. I think I actually saved a little bit more time than that. Okay. In specific response, Judge Posner, to your question to counsel, there was a legal opinion. Of course there was a legal opinion, the Louis Brisbane thing that said, if you do it this way, it's perfectly valid. Now what they said is they didn't do it that way, and that's what they told the district court. In other words, they said they acquired the life insurance policies before they were even issued in this. But what they're doing and what they did to the district court is conflate two unrelated policies. There is an ACSA policy that happened before this, and then the Ohio policy happened later. The ACSA policy was assigned before the Ohio policy was issued. That's a different assignment. And then on July 17th, the Ohio policy was assigned. So we're talking two different assignments. They thought they were complying with the legal opinion. They did not set out to acquire insurance with no insurable interest. That would have been stupid. That's void ab initio. They thought they were doing it the way it was specified. It's of no significance to me or actually anybody in this case whether they were correct or not, because the question is, if I can persuade you that civil conspiracy is an intentional tort that requires a specific intent to violate a known right or to create harm, then they should be allowed their summary judgment was inappropriate. The second thing is that despite those statements, Mavash Maradi does not admit that she lied. She didn't lie. She was allowed to delegate this process to a subagent, and the subagent filed an affidavit saying, I know of nothing that's wrong. The financial information submitted by these individuals was submitted to the subagent. Ohio even did a home visit. They say he didn't, but it's right in the record. They did a home visit. The subagent said, I believe the information they gave me was correct. And Mavash Maradi did not certify that there were no other life insurance policies. Her agent's report said this policy is not to replace any other policy. They did. And then she didn't take any of the other applications, so she never admitted lying in these applications. And so there are material questions of fact. The intent really can't be resolved through summary judgment in the case. And, well, that's it. Thank you very much. Okay. Well, thank you very much to all three counsels, and the Court will be in recess until tomorrow.